United States District Court
Middle District of Florida
Tampa Division

**DIANE E. FICARRA, ON BEHALF OF
NICOLE RENEE LITTLE, DECEASED,**

*Plaintiff,*

v.                                                          **NO. 8:25-cv-2337-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

*Defendant.*

---

# Order

Proceeding under 42 U.S.C. § 405(g), the plaintiff requests judicial review of a final decision by the Commissioner of Social Security. Doc. 1. The procedural history (a lengthy one), the evidence, and the law are summarized in the decision, Tr. 2607–27, and the parties' briefs, Docs. 6, 7, and not fully repeated here. The claimant is deceased. Her sister is the plaintiff.

**1.**

Section 405(g) details the scope of review:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner …, with or without remanding the cause for a rehearing. The findings of the Commissioner … as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner … or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner …, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed …, the court shall review only the question of

> conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3) (incorporating the scope of review for decisions about supplemental security income). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoted authority omitted). A court may not decide facts anew, make credibility findings, or reweigh the evidence. *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1320 (11th Cir. 2021).

**2.**

In the decision, the Administrative Law Judge (ALJ) found that the claimant had met the insured status requirements through December 31, 2014. Tr. 2611. The ALJ observed that the claimant had alleged an onset date of May 19, 2011, and died on March 20, 2021. Tr. 2611. The ALJ found that the claimant had not engaged in substantial gainful activity between the alleged onset date and the day she died. Tr. 2611.

The ALJ found that the claimant had suffered from severe impairments of degenerative disc disease of the lumbar and thoracic spines, peripheral neuropathy, fibromyalgia, adjustment disorder, depressive disorder, bipolar disorder, polysubstance dependence in early remission, cocaine-use disorder, and alcohol dependence. Tr. 2611.

The ALJ found that the claimant had had non-severe impairments of migraine headaches, pulmonary problems, acne, carpal tunnel syndrome, hepatitis C, acute fracture of the middle phalanx of the right digit, irritable bowel syndrome, and gastroesophageal reflux disease. Tr. 2611. The ALJ

explained that "the claimant [had] received either brief, routine, conservative treatment, or, at times, more involved treatment, but in either case, there is no evidence that these impairments resulted in lasting sequelae." Tr. 2611–12.

The ALJ found that the claimant had not had an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 2612. The ALJ specifically considered Listings 1.15, 1.16, 11.14, and, "in conjunction with SSR 12-2p," Listing 14.09. Tr. 2612. The ALJ observed that Olivia Bajor, D.O., had opined that the claimant did not meet or equal Listing 14.09. Tr. 2612.

The ALJ found that the claimant had had no limitation in understanding, remembering, or applying information; no limitation in interacting with others; a mild limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing oneself. Tr. 2613–14. The ALJ found that the evidence failed to establish the presence of the "paragraph C" criteria because the claimant had not had either "a serious and persistent mental disorder requiring a highly structured setting" or "a minimal capacity to adapt to changes in her environment or demands that are not already part of her daily life." Tr. 2614.

The ALJ found that the claimant had possessed the residual functional capacity (RFC) to perform sedentary work, with these additional limitations:

> [T]he claimant will need to stand for 15 minutes after 45 minutes of sitting. [She] can handle and finger items frequently with the left hand, and with the right hand. [She] can climb ramps and stairs occasionally[;] climb ladders, ropes, or scaffolds occasionally[;] balance occasionally[;] stoop occasionally[;] kneel occasionally[;] crouch occasionally[; and] crawl occasionally. [She] can never work in vibration. She is able to perform simple, routine tasks and make simple work-related decisions.

3

Tr. 2615.

The ALJ summarized the claimant's allegations:

> The claimant alleged she was disabled due to anxiety, depression, fibromyalgia, migraines, peripheral neuropathy, and a herniated disc at L5 (Ex. 2E/2 [Tr. 152]). [She] has alleged both physical and mental impairments. She alleged she could not lift over 20 pounds, stand or sit longer than an hour, and had pain with bending and twisting. She also stated she had migraines four times a week, got dizzy, and had light sensitivity. She stated she had weakness, fatigue, and tingling in her hands, arms, legs, and feet (Ex. 2E/2 [Tr. 152]). The claimant alleged she needed help with dressing but could perform her own bathing, shaving and feeding, and chores, but it depended on her pain levels (Ex. 4E/4, 5 [Tr. 165–66]).

Tr. 2615.

The ALJ summarized the testimony of the claimant's father:

> At the previous telephonic hearing held on July 12, 2021, before me, with my previous decision remanded, the claimant's father, Jos[ep]h Little, as her substitute party provided the following testimony:
>
> The claimant's father stated that he interacted with [her] a few times a week, and that [she] had neck issues while she noted that she had pain. Mr. Little professed that he would take her grocery shopping and that he could tell that she was suffering or in pain. [He] asserted that he would take her to the doctor appointments. He disclosed that she was living with her mother at that time.
>
> Mr. Little testified that the claimant could hardly carry anything, that she had numbness, and that he would worry about her driving. He explained that [her] hands would get numb and that she would drop things. [He] said that her mother helped her with cleaning, but that she would cook and make food such as sandwiches and cook in the microwave such as making frozen foods. [Her] older sister would also help out.
>
> The claimant's father asserted that the claimant could not get some of her medication for the fibromyalgia, but they would help her pay for her medications. He testified that [she] would complain that her

4

> medications would not help her so she would use medications not prescribed to her such as cocaine. He said that she was doing drugs to remove physical pain, that she got ahold of Fentanyl instead of cocaine and that she accident[all]y died.
>
> He professed that she watched television a lot and went to the doctor a lot. She did have a boyfriend who would come visit her. [Her] boyfriend passed away from a heart attack. [She] used a lounge chair to sit in and lumbar cushions. At times, [she] would use the heating pad for pain. He said that it would bother her to recline. [He] revealed that [she] had some exercise equipment for … physical therapy that she did at home.
>
> The claimant's father testified that she went for treatment for mental health, day in and day out with fibromyalgia pain and no money, and that she was always asking for money, and this was really hard and that is why she asked for disability.
>
> Mr. Little stated that the claimant was a college graduate and that she worked for the county and social services, for Horizon and Community Missions, Niagara County while doing the same thing at these jobs. He professed that [she] stopped working due to back pain.

Tr. 2615–16.

The ALJ found that the claimant's medically determinable impairments could have reasonably been expected to cause the alleged symptoms, but the statements about the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the record. Tr. 2616. The ALJ provided this explanation:

> The claimant's statements about the intensity, persistence, and limiting effects of her symptoms are inconsistent because the objective imaging and examinations show that [she] had only mild to moderate impairment (Ex[s]. 6F; 28F; 29F; 39F; 47F [Tr. 272–77, 1249–1340, 1501–48, 1796–1809]). The physical examinations consistently revealed that [she] retained good strength, range of motion, and sensation (Ex[s]. 3F; 6F; 52F [Tr. 253–61, 272–77, 1941–49]). The mental exams showed that when she was compliant with medication, she had had a euphoric mood, a full range of affect, an intact memory, judgment and insight within normal limits, and

5

> normal cognition (Ex. 49F [Tr. 1812–22]). She had a good response to treatment when she was compliant, resulting in a wider [RFC] (Ex. 51F [Tr. 1909–40]). Further, looking at [her] reported activities of daily living, that include a wide range of activities that show few restrictions. [Her] own reporting and testimony, illustrated that she was capable of handling personal care, making meals, lifting and carrying, socialization, maintaining attention and concentration, and exertional activities consistent with the [RFC] assessment. [She] also reported that she was stable and was able to control her pain consistently (Ex[s]. 4E; 5F; 6F; 11F; 28F [Tr. 162–74, 267–77, 319–37, 1249–80]).

Tr. 2616–17.

The ALJ summarized the medical evidence in chronological order, beginning with evidence from 2011 and 2012:

> An MRI of the lumbar spine dated September 7, 2011, demonstrates slight straightening of the normal lumbar lordosis; at the L4-5 there is a minimal diffuse disc bulge with annulus fibrosis, which minimally impinges upon the anterior surface of the thecal sac at this level (Ex. 15F/19 [Tr. 413]). On physical examination, [she] was found by Dr. Singh on October 14, 2011, to have fully normal sensory and motor results, a steady gait, and full strength in all muscle groups (Ex. 3F/2 [Tr. 254]). The same was true on examination [on] November 14, 2011, although she complained of pain all over her body and now claimed the Flexeril did not help (Ex. 3F/4 [Tr. 256]). That December, with tender points allegedly all over her body, Dr. Singh thought [she] "might have fibromyalgia." (Ex. 3F/6 [Tr. 258]). A fourth examination in January 2012 led Dr. Singh to note [she] had some decreased sensation in her feet that might be related to B12 deficiency. He reported it as neuropathy (Ex. 3F/9 [Tr. 261]).
>
> An MRI of the cervical spine dated June 4, 2012, demonstrated straightening of the normal lordotic curvature with slight dextroscoliosis of the lower cervical spine (Ex. 15F/24 [Tr. 418]). There is no evidence of spondylolisthesis or vertebral body compression. No significant degenerative disc disease was noted. The cervical cord was normal in size and signal intensity without evidence of myelomalacia (Ex. 15F/24 [Tr. 418]).

Tr. 2617.

The ALJ continued with a summary of medical evidence from 2013 to 2016:

On January 2, 2013, the claimant presented to Hongbiao Liu, M.D. for a physical consultative examination (Ex. 6F/1-6 [Tr. 272–77]). Dr. Liu noted [that she] reported fibromyalgia diagnosed in 2011, chronic lower back pain since the same time, and bilateral lower extremity neuropathy, also diagnosed at the same time. She stated an MRI scan had demonstrated lumbar disc herniation, as well as migraine headaches two to three times a week for a year. Her irritable bowel syndrome and sleep apnea, both of which she said were stable since 2010. [She] admitted smoking a pack of cigarettes daily since age sixteen (Ex. 6F/1, 2 [Tr. 272–73]). In discussing her activities of daily living, she reported she could do cooking occasionally. She cleaned the house two to three times a week. She shops one to two times a month. She showered five times a week. She dressed herself every day. She liked to watch TV, listen to the radio, and socialize with friends (Ex. 6F/2 [Tr. 273]). On physical examination, [her] condition was found to be normal, except she had some mild [difficulty] walking on her heels and toes due to back pain. [She] had full strength in the upper and lower extremities and deep tendon reflexes within normal limits (Ex. 6F/4 [Tr. 275]). Her squatting was reduced to thirty percent due to back pain. Her stance, however, was normal, she needed no assistive devices, and she needed no help changing for the examination or getting on or off the examination table. Her cervical spine showed full range of motion, while her lumbar spine showed flexion and extension to 80 degrees, lateral flexion 20 degrees bilaterally, and rotation 20 degrees bilaterally. She had positive straight leg raising test results at 45 degrees bilaterally. Based on his examination of [her], Dr. Liu concluded she had only mild limitation for prolonged walking, bending, kneeling or overhead reaching. [Her] lumbar x-ray was entirely normal (Ex. 6F/4 [Tr. 275]).

In February 2013, Thomas Hughes, M.D. disclosed the claimant came for her annual examination (Ex. 11F/4 [Tr. 322]). Dr. Hughes reported [she] complained of chronic pain associated with fibromyalgia. However, Dr. Hughes documented that [her] examination findings were normal. Moreover, Dr. Hughes reported [she] was "basically stable" when mentioning that she had chronic pain syndrome and symptoms of fibromyalgia. [She] wanted to find a new pain management physician. Dr. Hughes found [her] to be "basically in control at this time" and no new medications were

ordered, and no visit scheduled for another six months (Ex. 11F/4, 5 [Tr. 322–23])[.]

In September 2013, Dr. Hughes [saw] the claimant again and [she] stated that, "she is actually feeling fairly well." (Ex. 11F/11, 12 [Tr. 329–30]). She had no headaches, no lightheadedness, and no chest discomfort, although she did report occasional shortness of breath followed by the use of her inhaler. Her depression was reported under fairly good control, as was her anxiety, although she asked for a refill of her Xanax. Despite the absence of any evidence of any examination for it, Dr. Hughes stated he intended to fill out a handicap sticker request for [her] based on fibromyalgia (Id[.] [Tr. 329–30]).

An MRI of the thoracic spine dated September 3, 2014, demonstrated that her disc pathology at the T7-T8 level where there was a right paracentral disc protrusion/herniation with a tear of the annulus fibrosus with deformity to the spinal cord (Ex. 28F/5 [Tr. 1253]). Her follow-up visit with Dr. Hughes on December 23, 2014, noted on review of systems, [she] had chronic pain syndrome and took meloxicam at the direction of her pain management doctor (Ex. 28F/8 [Tr. 1256]). However, it was also noted that she was in "fairly good health." Then her follow-up visit on August 6, 2015, noted [she] was in no distress (Ex. 28F/11 [Tr. 1259]). Dr. Hughes assessed [her] with fibromyalgia for which he ordered physical therapy. Then her follow-up visit on January 26, 2016, noted [her] history of chronic pain, which is actually adequately controlled and her last substance use other than Suboxone was in mid-November (Ex. 28F/22 [Tr. 1270]).

The claimant's physical therapy records from March 2016 showed her home exercise program was helping, and she was feeling good doing stretches (Ex. 45F/07 [Tr. 1778]). Her follow-up visit with Dr. Hug[h]es on July 26, 2016, noted [she] was stable (Ex. 28F/28 [Tr. 1276]). She stated she found a new chronic medical pain management doctor and was very optimistic. Treatment records from Geraci Spine and Sports Medicine dated July 26, 2016, documented [that she] was diagnosed with chronic pain syndrome, fibromyalgia, thoracic disc herniation T7-8 and cervical spine disc bulge at C4-5 (Ex. 29F/18 [Tr. 1298]).

Tr. 2617–18.

The ALJ continued with a summary of the medical evidence from 2019, pertaining to the claimant's physical impairments:

> On February 27, 2019, the claimant presented to Vikas Pilly, M.D., with complaints of pain in the neck, middle back, and lower back with radiating pain to both legs (Ex. 52F/4 [Tr. 1944]). She reported she had been involved in a motor vehicle accident on July 25, 2018, which worsened her pain (Id[.] [Tr. 1944]). However, her MRI from January 17, 2019, of the cervical and lumbar spine was "essentially normal" (Id[.] [Tr. 1944]). [She] reported no progressive weakness but that her pain was aggravated by standing, walking, and moving her neck (Id[.]/5 [Tr. 1945]). Her exam showed she walked with a normal gait, had a []minimally positive right and left facet pain in the cervical spine, had a full range of motion with no pain, and had a negative Spurling's testing bilaterally (Id[.]/7 [Tr. 1947]). Her lumbar spine showed "minimally positive lumbar spine tenderness", positive thoracic and lumbar paraspinal trigger points on the right and left, and negative sacroiliac joint tenderness (Id[.] [Tr. 1947]). Her hips, knees, shoulders, and elbows, all showed a full range of motion with no pain. She also had intact sensation to light touch in all extremities, full strength in every joint, and deep tendon reflexes within normal limits (Id[.]/7, 8 [Tr. 1947–48]).
>
> On March 7, 2019, the claimant presented to Craig Horner, DC, with complaints of neck, upper back, and lower back pain (Ex. 52F/02 [Tr. 1942]). Her exam indicated muscle tenderness in the cervical, thoracic, and lumbar paraspinals as well as the upper trapezius (Ex. 52F/3 [Tr. 1943]).

Tr. 2618–19.

The ALJ summarized medical evidence from Niagara Falls Medical Center from August 2020, including this information about the claimant's physical impairments:

> [T]he claimant had cardiovascular, respiratory, chest wall, back, and gastrointestinal examinations within normal limits ([Ex. 56F]/45 [Tr. 2435]). On a musculoskeletal examination, she had normal range of motion, normal strength, no tenderness, no deformity and left index finger swelling at the PIP joint but full range of motion and non-tender while neurologically intact (Id[.] [Tr. 2435]). [Her] minor

9

> left index finger condition resolved within 12-months. She merely had a bruise o[n] her left index finger (Id[.]/44 [Tr. 2434]).

Tr. 2620.

The ALJ analyzed the medical opinions. Tr. 2620–24. The ALJ summarized an opinion of Dr. Liu: "[O]n January 3, 2013, Dr. Liu, an internal consultative examiner, opined the claimant has mild limitation for prolonged walking, bending, kneeling, or overhead reaching (Ex. 6F/4 [Tr. 275])." Tr. 2620. The ALJ found that the opinion was entitled to "very limited weight," explaining, "[E]ven though [the] claimant received conservative treatment, she does continually receive a variety of modalities for treatment of her pain." Tr. 2620.

The ALJ summarized the opinions of Dr. Hughes:

> In October 2013, Dr. Hughes opined that the claimant is disabled due to back and neck problems (Ex[.] 11F/13 [Tr. 331]). Additionally, Dr. Hughes opined that [her] peripheral neuropathy limited her ability to walk, stand, lift, push, climb, use any stairs, and that she had moderate limitations in sitting and using her hands. Later in March 2014, Dr. Hughes completed an application for a parking permit and indicated that [she] was permanently disabled and severely limited in the ability to walk due to an arthritic, neurological or orthopedic condition (Ex[.] 12F [Tr. 338–39]).

Tr. 2620. The ALJ found that the opinion that the claimant was disabled was entitled to no weight because the disability determination is for the ALJ. Tr. 2620. The ALJ found that the "more specific opinions … warrant very limited weight," explaining, "[T]he evidence of record and other opinion evidence did not indicate that the claimant had severely limited ability to walk, moderate limitation in sitting and using her hands, etc." Tr. 2620–21.

The ALJ summarized the opinions of Dr. Bajor and the procedural background about the opinions:

> Dr. Bajor, a medical expert[,] submitted responses to medical interrogatories on August 10, 2021 (Ex[s]. 59F/1-5; 60F/1, 2; 63F/1-4 [Tr. 2574–80, 2593–96]). Dr. Bajor opined the claimant had severe impairments due to degenerative disc disease of the spine, fibromyalgia/asthma, and substance abuse, but deferred to a psychiatric opinion for an evaluation of this and her psychological disorders (Ex. 63F/2 [Tr. 2594]). Dr. Bajor also opined that the claimant did not meet any of the listings, and specifically cited listings 1.15, 1.16, and 14.09(D) as being considered (Ex. 63F/3 [Tr. 2595]). Since [she] did not meet any listings, Dr. Bajor was asked to formulate [an RFC] assessment in the interrogatories. Dr. Bajor opined the claimant would be limited to lifting five pounds frequently and ten pounds occasionally; could sit two hours at a time for a maximum of six hours in an eight-hour day; could stand for one hour at a time and walk 30 minutes at a time, with combined ability to stand and/or walk four hours in an eight-hour day, needs to change position every one hour for fifteen minutes; may have needed unscheduled absences due to chronic pain flare ups four days per week; could use her upper extremities frequently, and stoop, kneel, crouch, and crawl occasionally; should have avoided driving, unprotected heights, and ladders, ropes, and scaffolds due to medication side effects and pain; and should have avoided exposure to pulmonary irritants (Ex. 63F/4 [Tr. 2596]).
>
> The Appeals Council's order of remand disclosed that medical examiner Dr. Bajor completed interrogatories and opined, in part, that the claimant could stand for one hour and needed to change positions every one hour for fifteen minutes (Ex[.] 63F [Tr. 2593–96]). I previously held that this portion of Dr. Bajor's opinion was inconsistent with conservative management and more reflective of the claimant's subjective complaints and thus not provided. The Appeals Council's order of remand held that Dr. Hughes provided an explanation for the sit/stand opinion and supported the same with findings. Overall, as set forth above, Dr. Bajor, a medical expert[,] opined the claimant is restricted to a limited range of sedentary work (See Ex. 63F [Tr. 2593–96]).

11

Tr. 2621. The ALJ found that the opinions were entitled to varying degrees of weight and provided this explanation:

> I re-reviewed Dr. Bajor's opinion and findings provided in conjunction with the evidence as a whole and other opinion evidence and find that the claimant is provided with a sit/stand option in accordance with Dr. Bajor's opinion given the same warrants significant weight as did the finding that [she] could perform sedentary exertion, frequently could use her upper extremities and that she had postural limitations as determined. However, I also find that Dr. Bajor's specific opinion is internally inconsistent as it talks about moderate physical findings, but opines the claimant had very significant limitations in that her pain would have affected [her] ability to perform activities related to work, which is grossly out of line with [her] conservative treatment and the generally normal and/or mildly abnormal physical findings as well as other opinions; and, therefore, I find this portion of Dr. Bajor's opinion warrants no weight with regard to the claimant needing required breaks or miss days of work, pulmonary restrictions, no driving, and sitting, standing, and walking limitations less than a full 8-hour workday. In making this determination, I emphasize that Dr. Bajor's assessment that the claimant would have chronic absences and/or miss days of work are not consistent with this conservative management with again such limitations only supported by her subjective complaints that are not consistent with the evidence of record in this regard. Additionally, an explanation for these findings lacks support in the narrative beyond a citation of the severe impairments and review of the … exams in Exhibits 3F and 6F (Ex. 63F/2 [Tr. 2594]). The physical findings beyond her initial imaging in 2014 and then updated imaging in 2019, are not supportive of additional limitations beyond those provided. There are few physical records after 2019, and the summation of them by Dr. Bajor, with specific citations to the evidence, lends to the weight they can be given. For example, Dr. Bajor documented that the claimant had a normal gait, strength, and sensation despite positive straight leg raising testing (Id[.]; Ex[s]. 3F; 6F [Tr. 253–61, 272–77, 2594]). Dr. Bajor disclosed [that she] had cervical and lumbar spine MRIs that are normal with prior films showing some of loss of curve and slight annual fissure (Id[.]; Ex. 15F [Tr. 395–426, 2594]). Dr. Bajor stated [that she] has mention of tender points, but that the same are not specifically documented, although [she] merely complains of diffuse body pain (Id[.]; Ex. 3F [Tr. 253–61, 2594]). Further, Dr. Bajor accorded the claimant environmental limitations due to asthma but

12

disclosed her asthma is fairly stable with only occasional use of inhaled medications (Ex. 11F [Tr. 319–37]). I emphasize that I have included the sit/stand opinion with the claimant's assessed [RFC] for a limited range of sedentary work and the vocational expert testified that such a hypothetical individual could have still performed the sedentary jobs as set forth below which I find are a significant number of other jobs in the national economy with this limitation not significantly eroding such jobs she could have performed.

Tr. 2621–22.

The ALJ provided this summary of the RFC:

Again, I find that the claimant is limited to sedentary work per the opinion by Dr. Bajor as outlined above (Ex. 63F [Tr. 2593–96]). The case was remanded to consider the opinions regarding a sit/stand option by Dr. Bajor, which I included in the claimant's assessed [RFC]. The claimant only warranted the limitations that I provided when considering all the opinion evidence of record including Dr. Bajor's opinion and the evidence as a whole given, she underwent only conservative management for her pain complaints. She did not have supported need for the limitation of absences from work provided by Dr. Bajor and other limitations in accordance with my analysis herein above. Moreover, I limited [her] to sedentary work with restrictions to avoid exacerbation of her pain.

… Niagara County Department of Mental Health treatment notes disclosed that the claimant has been taking opioids not prescribed to her (Ex. 24F [Tr. 871–934]), which is also noted throughout the record. Despite her substance abuse and alcohol condition, she continued to attend appointments. Further, the provider noted that she adamantly refused treatment for her substance use and she was very focused on getting medications for her pain, stating her medications were ineffective. Provider implied that none of her pain complaints were based in objective findings [(]Id[.]/62 [Tr. 932]). I find even when using substances and/or alcohol, [she] could perform a significant number of other jobs in the national economy as set forth herein below. As such, I further find that [her] substance abuse and alcohol abuse are not contributing factors material to a determination of disability.

Tr. 2624.

13

The ALJ found that the claimant had been unable to perform any past relevant work. Tr. 2624–25. The ALJ observed that the claimant had been born in 1979 and had been considered a "younger individual" on the alleged onset date. Tr. 2625. The ALJ observed that the claimant had possessed at least a high school education. Tr. 2625. Based on the testimony of a vocational expert, the ALJ found that, considering the claimant's age, education, work experience, and RFC, the claimant could have performed jobs existing in significant numbers in the national economy, such as "semiconductor bonder"; "charge account clerk"; and "order clerk, food and beverage." Tr. 2625–26. The ALJ therefore found that the claimant had not been disabled from the alleged onset date (May 19, 2011) until she died (March 20, 2021). Tr. 2625.

### 3.

The plaintiff argues that the ALJ improperly rejected the opinions of Dr. Hughes and Dr. Bajor. Doc. 6 at 5–16. Both parties agree, and are correct, that the regulations for claims filed before March 27, 2017, apply. Doc. 6 at 5–6; Doc. 7 at 7 n.3.

Regardless of its source, the Social Security Administration (SSA) "will evaluate every medical opinion" it receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of ... impairment(s), including ... symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and ... physical or mental restrictions." *Id.* §§ 404.1527(a)(1), 416.927(a)(1). An opinion on an issue that is dispositive of a case, such as whether a claimant is disabled or able to work, is not a medical opinion because it is an opinion on an issue reserved to the Commissioner. *Id.* §§ 404.1527(d)(1), 416.927(d)(1). The SSA "will not give any special significance to the source of

14

an opinion on issues reserved to the Commissioner[.]" *Id.* §§ 404.1527(d)(3), 416.927(d)(3).

An ALJ must state with particularity the weight given to a medical opinion and the reasons for the weight. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Id.* (quoted authority omitted).

The SSA generally will give more weight to the medical opinion of a treating source because treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations[.]" 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ need not give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41.

Unless the SSA gives a treating source's opinion controlling weight, the SSA will consider these factors to decide the weight to give the medical opinion: the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; supportability; consistency; specialization; and any other relevant factor. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6). An ALJ need not explicitly address each factor.

As required by the regulations, the ALJ considered Dr. Hughes's opinions, stated the weight he was giving them, and explained his reasoning: the opinion that the claimant had been disabled warrants no weight because the ALJ makes the disability finding, and the more specific opinions warrant "very limited weight" because the evidence "did not indicate that the claimant had [had a] severely limited ability to walk, moderate limitation in sitting and using her hands, etc." Tr. 2620–21. Those reasons amount to good cause, and substantial evidence supports them. The substantial evidence, cited by the ALJ, includes this evidence:

- The September 2011 MRI showed only slight straightening of the normal lumbar lordosis and only a minimal diffuse disc bulge with annulus fibrosis at L4-5, causing only minimal impingement. Tr. 2617 (citing Ex. 15F/19 (Tr. 413)).

- During the October and November 2011 physical examinations, the claimant had had fully normal sensory and motor results, a steady gait, and full strength in all muscle groups. Tr. 2617 (citing Ex. 3F/2, 4 (Tr. 254, 256)).

- The June 2012 MRI of the cervical spine showed straightening of the normal lordotic curvature with only slight dextroscoliosis of the lower cervical spine, no evidence of spondylolisthesis or vertebral body compression, no significant degenerative disc disease, a normal-sized cervical cord, and no evidence of myelomalacia. Tr. 2617 (citing Ex. 15F/24 (Tr. 418)).

- In January 2013, the claimant had reported that she occasionally cooked, cleaned the house two or three times a week, shopped once or twice a month, showered five times a week, and dressed herself. Tr. 2617 (citing Ex. 6F/2 (Tr. 273)). Her physical condition had been normal except for mild difficulty walking on her heels and toes because of back pain, she had had full strength in her upper and lower extremities, she had had normal deep tendon reflexes, her squatting had been reduced to thirty percent because of back

16

pain but her stance had been normal, she had needed no assistive device, she had needed no help changing clothes or getting on and off the examination table, and she had had full range of motion in her cervical spine. Tr. 2617 (citing Ex. 6F/4 (Tr. 275)). Her lumbar x-ray was normal. Tr. 2617 (citing Ex. 6F/4 (Tr. 275)). Dr. Liu found that she had had only a mild limitation for prolonged walking, bending, kneeling, or overhead reaching. Tr. 2617 (citing Ex. 6F/4 (Tr. 275)).

- In February 2013, Dr. Hughes documented normal examination findings and reported that the claimant had been "basically stable," ordered no new medication, and scheduled no visit for another six months. Tr. 2618 (citing Ex. 11F/4, 5 (Tr. 322–23)).

- In September 2013, Dr. Hughes noted that the claimant had reported "feeling fairly well." Tr. 2618 (citing Ex. 11F/11, 12 [Tr. 329–30]).

- In December 2014, Dr. Hughes noted that the claimant had been in "fairly good health." Tr. 2618 (citing Ex. 26F/8).

- In August 2015, Dr. Hughes noted that the claimant had been in no distress and ordered physical therapy for fibromyalgia. Tr. 2618 (citing Ex. 28F/11 (Tr. 1259)).

- In January 2016, Dr. Hughes noted that the claimant's chronic pain had been adequately controlled. Tr. 2618 (citing Ex. 28F/22 (Tr. 1270)).

- March 2016 physical therapy records showed that a home exercise program had been helping the claimant, and she had felt good stretching. Tr. 2618 (citing Ex. 45F/07 (Tr. 1778)).

- In July 2016, Dr. Hughes noted that the claimant had been stable and optimistic. Tr. 2618 (citing Ex. 28F/28 (Tr. 1276)).

- In February 2019, the claimant had presented to Dr. Pilly with complaints of neck and back pain radiating to both legs, reporting that she had been in a car accident in July 2018

17

that worsened her pain. Tr. 2619 (citing Ex. 52F/4 (Tr. 1944)). But her January 2019 MRI of the cervical and lumbar spines was "essentially normal." Tr. 2619 (citing Ex. 52F/4 (Tr. 1944)). An exam showed that she had walked with a normal gait, had a minimally positive right and left facet pain in the cervical spine, had a full range of motion with no pain, and had a negative Spurling's testing bilaterally. Tr. 2619 (citing Ex. 52F/7 (Tr. 1947)). Her lumbar spine had shown "minimally positive lumbar spine tenderness," positive thoracic and lumbar paraspinal trigger points on the right and left, and negative sacroiliac joint tenderness. Tr. 2619 (citing Ex. 52F/7 (Tr. 1947)). Her hips, knees, shoulders, and elbows all had shown a full range of motion with no pain. Tr. 2619. She had had intact sensation to light touch in all extremities, full strength in every joint, and deep tendon reflexes within normal limits. Tr. 2619 (citing Ex. 52F/7, 8 (Tr. 1947–48)).

- In August 2020, the claimant had had cardiovascular, respiratory, chest wall, back, and gastrointestinal examinations within normal limits. Tr. 2620 (citing Ex. 56F/45 (Tr. 2435)). On a musculoskeletal examination, she had had normal range of motion, normal strength, no tenderness, no deformity, and left index finger swelling at the PIP joint but full range of motion and non-tender while neurologically intact. Tr. 2620 (citing Ex. 56F/45 (Tr. 2435)).

- In August 2021, Dr. Bajor opined that the claimant could have performed a limited range of sedentary work. Tr. 2621 (citing Ex. 63F (Tr. 2593–96)).

The plaintiff argues that the ALJ improperly failed to provide an "articulated" reason for giving Dr. Hughes's opinions less weight and further argues that the analysis is flawed because the opinions were not inconsistent with the evidence. Doc. 6 at 8, 10. The excerpted parts of the decision show that the ALJ articulated the reasons for giving Dr. Hughes's opinions "very limited weight," and substantial evidence supports the reasoning.

18

As required by the regulations, the ALJ considered Dr. Bajor's opinions, stated the weight he was giving them, and explained his reasoning for giving some of the opinions "no weight":

> I also find that Dr. Bajor's specific opinion is internally inconsistent as it talks about moderate physical findings, but opines the claimant had very significant limitations in that her pain would have affected [her] ability to perform activities related to work, which is grossly out of line with [her] conservative treatment and the generally normal and/or mildly abnormal physical findings as well as other opinions; and, therefore, I find this portion of Dr. Bajor's opinion warrants no weight with regard to the claimant needing required breaks or miss days of work, pulmonary restrictions, no driving, and sitting, standing, and walking limitations less than a full 8-hour workday. In making this determination, I emphasize that Dr. Bajor's assessment that the claimant would have chronic absences and/or miss days of work are not consistent with this conservative management with again such limitations only supported by her subjective complaints that are not consistent with the evidence of record in this regard. Additionally, an explanation for these findings lacks support in the narrative beyond a citation of the severe impairments and review of the … exams in Exhibits 3F and 6F (Ex. 63F/2 [Tr. 2594]). The physical findings beyond her initial imaging in 2014 and then updated imaging in 2019, are not supportive of additional limitations beyond those provided. There are few physical records after 2019, and the summation of them by Dr. Bajor, with specific citations to the evidence, lends to the weight they can be given. For example, Dr. Bajor documented that the claimant had a normal gait, strength, and sensation despite positive straight leg raising testing (Id[.]; Ex[s]. 3F; 6F [Tr. 253–61, 272–77, 2594]). Dr. Bajor disclosed [that she] had cervical and lumbar spine MRIs that are normal with prior films showing some of loss of curve and slight annual fissure (Id[.]; Ex. 15F [Tr. 395–426, 2594]). Dr. Bajor stated [that she] has mention of tender points, but that the same are not specifically documented, although [she] merely complains of diffuse body pain (Id[.]; Ex. 3F [Tr. 253–61, 2594]). Further, Dr. Bajor accorded the claimant environmental limitations due to asthma but disclosed her asthma is fairly stable with only occasional use of inhaled medications (Ex. 11F [Tr. 319–37]). I emphasize that I have included the sit/stand opinion with the claimant's assessed [RFC] for a limited range of sedentary work and the vocational expert testified that such a hypothetical individual could have still performed the sedentary jobs as set forth below which I find are a significant

19

number of other jobs in the national economy with this limitation not significantly eroding such jobs she could have performed.

Tr. 2621–22. Those reasons amount to good cause, and substantial evidence, already discussed, supports them.

Observing that Dr. Bajor's opinions concern limitations back to 2011 and that eligibility for disability benefits expired in 2014, the plaintiff criticizes the ALJ's reasoning that few physical records exist after 2019. Doc. 6 at 15. This criticism is for naught. The reason was pertinent to the claim for supplemental security income. Moreover, the reason was only one of many for rejecting some of Dr. Bajor's opinions. *See* Tr. 2621–22.

The plaintiff criticizes the ALJ's reliance on conservative treatment as a basis for rejecting some of Dr. Bajor's opinions, emphasizing that the claimant had been prescribed long-acting morphine, *see* Tr. 336; Lortab, *see* Tr. 254; Flexeril, *see* Tr. 254; a TENS unit, *see* Tr. 254; Lyrica, *see* Tr. 259; Cymbalta, *see* Tr. 261; Mobic, *see* Tr. 760; Baclofen, *see* Tr. 760; trigger point injections, *see* Tr. 749; and physical therapy, *see* Tr. 229. Doc. 6 at 15–16. The plaintiff relies on *Henry v. Commissioner of Social Security*, 802 F.3d 1264, 1268 n.2 (11th Cir. 2015). Doc. 6 at 16–17. In *Henry*, the Eleventh Circuit reversed an ALJ's decision, holding that the ALJ's rejection of a consultative examining physician's opinion was not supported by substantial evidence because the ALJ drew a "negative inference" from the absence of treatment as the sole reason for rejecting the opinion without developing the record regarding the claimant's explanation that he could not afford treatment. 802 F.3d at 1268. In a footnote, the Eleventh Circuit made this observation: "[The claimant] received Tramadol, a narcotic-like medication used to treat severe pain, from a free clinic. The magistrate judge emphasized this piece of evidence … to

20

indicate that the ALJ's rejection of [the physician]'s opinion was not supported by substantial evidence. As the magistrate judge wrote, '[u]se of strong pain medication is not consistent with the finding that [the claimant]'s treatment was conservative.'" *Id.* at 1268 n.2.

The plaintiff shows no reversible error. Whether treatment is conservative is a finding dependent on the specific circumstances, thus limiting the persuasive value of another case. Here, the ALJ's finding was based on the treatment the claimant had received over the lengthy period considered. Tr. 2617–20. Moreover, the ALJ did not rely solely on conservative treatment to reject some of Dr. Bajor's opinions. *See* Tr. 2621–22 (finding inconsistency between moderate physical findings and significant limitations; finding that the significant limitations are "grossly" out of line with both conservative treatment and generally normal or mild physical findings and opinions; finding that the opinions are supported only by subjective complaints that are not consistent with the evidence; and finding that an adequate explanation is absent). Tr. 2621–22.

**4.**

The Commissioner's final decision is **affirmed**. The clerk is **directed** to enter judgment for the Commissioner of Social Security and against Diane E. Ficarra, on behalf of Nicole Renee Little, and close the file.

**Ordered** in Jacksonville, Florida, on May 1, 2026.

*Patricia D. Barksdale*

Patricia D. Barksdale
*United States Magistrate Judge*

21